Modified.

**WHITE v. SYVERTSEN.**
Patent Appeal No. 2514.

Court of Customs and Patent Appeals.
Feb. 3, 1931.

BLAND, Associate Judge, dissenting.

G. F. De Wein, of Milwaukee, Wis., for appellant.

James L. Norris and Clarence A. Bateman, both of Washington, D. C., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals affirming the decision of the Examiner of Interferences awarding priority of invention to appellee, Harald Syvertsen.

The invention relates to an improvement in hydraulic turbines "of the type wherein water is delivered to the runner past an annular series of guide vanes * * * simultaneously adjustable about parallel axes * * * adapted to direct the water tangentially toward the runner blades." It involves the idea of arranging stop pins so that they project into cored-out or open spaces in the guide vanes, in such position as to permit free motion of the guide vanes during normal operation, and, in the event of accidental breakage of the connection between the guide vanes and the shifting ring—the means connecting the guide vanes to the operating mechanism—prevent them moving beyond a predetermined position and striking the vanes of the runner.

We quote counts 1 and 2 of the five counts involved in the issue:

"Count 1. The combination with a turbine and runner, of gate means mounted to have pivotal swinging operation and provided with an open space therein with opposite wall portions, and stop means secured to a part of the turbine and projecting into the open space of the gate means and concealed within the latter and operative with relation to said wall portions to limit the movement of the gate means in the event of breakage of the operating devices therefor.

"Count 2. The combination with a turbine installation including a runner and pivoted gates having an end portion with walls of stop pin means extending into the gates between the said walls without interfering with the normal opening and closing movements of the latter but preventing abnormal free movement thereof relatively to the runner."

Appellee, Syvertsen, the senior party, filed his application on February 20, 1925, and a patent, No. 1,570,536, was issued to him on January 19, 1926.

Appellant, White, the junior party, filed his application on May 27, 1926, more than four months after a patent had been issued to appellee. Accordingly, appellant had the burden of establishing priority of invention beyond a reasonable doubt.

Considerable testimony was introduced by the parties.

The tribunals below, in exhaustive opinions, in which the testimony is carefully analyzed and considered, concurred in holding that appellee conceived and disclosed the invention in 1919; that appellant conceived and disclosed the invention in September, 1924; that the evidence submitted by appellant was not sufficient to establish reduction to practice prior to appellee's filing date; and that, as appellee was the first to conceive and reduce the invention to practice, he was entitled to an award of priority.

With reference to appellant's claim that he reduced the invention to practice, prior to appellee's filing date, the Examiner of Interferences said:

"During the latter part of 1924 two large units for the Copco Plant of the California-Oregon Power Company were built in the Allis-Chalmers Plant which units were assembled and inspected for shipment as early as the early part of February.

"During the process of construction of these gates the turbine units were subjected to the certain shop tests consisting of manually swinging the gates from open to closed position very violently. This swinging was done beyond the normal open and closed position in order that the pins could be brought into action. There were no other tests of the invention within the knowledge of Gross who testified to the above-mentioned tests.

"There appears to be considerable diversity of opinion between the parties in interference as to the effectiveness of these shop tests, it being the view of White that such tests constitute a reduction to practice of the invention, while such a contention is opposed by Syvertsen, on the ground that such a test is not an approximation to the action of the forces operating against these gates under normal working conditions.

"It will be noted at this point that after the Copco units were installed no difficulties were experienced from the same. Whether this satisfactory operation on the part of the turbine shipped by the Allis-Chalmers Company was due to the fact that the gates had never been moved to a position where the stops came into play or not is not clear.

"It is believed by this tribunal that such shop tests do not constitute a reduction to practice of the invention. While the invention on its face may be considered simple in structure, the action of these gates when under the extreme hydraulic pressures and currents to which they are subjected is rather complex, and to violently swing the gates against the pins does not appear sufficient approximation to the normal working conditions to which these gates would be subjected as to constitute a reduction to practice. Theoretically calculating the water pressures and using a safety factor upon which factor the size of the stop is based cannot be considered a reduction to practice."

However, the Examiner of Interferences did not base his decision entirely upon his holding that appellant had failed to reduce the invention to practice until after appellee's filing date. But assuming, as he did for the purposes of his decision, that appellant had successfully reduced the invention to practice, he held, after stating and analyzing the testimony pertaining thereto, that appellee was diligent from the time appellant entered the field, September, 1924, until he reduced the invention to practice by filing his application on February 20, 1925.

The Board of Appeals rested its decision squarely upon the proposition that appellant's shop tests were not sufficient to demonstrate that the invention would function properly in actual use, and that he had not reduced the invention to practice prior to appellee's filing date.

Counsel for appellant contends that the invention had been completed by an actual reduction to practice for the following reasons: First, the invention in issue was actually constructed and made a part of a hydraulic turbine, the stop pins being so arranged as to permit free motion of the guide vanes during normal operation; second, the stop pins, it is claimed, were designed by competent hydraulic engineers to withstand the strain of the forces produced by the great pressure and velocity of the water rushing past the guide vanes in actual use, although these forces could not be calculated with assured accuracy; third, the stop pins were tested in the shop by swinging the guide vanes violently against them.

It is conceded that the invention was not tested in actual operation of the turbines. In this connection, appellant testified as follows:

"XQ. The stop pins, to be practically operative and useful for their intended purpose, would therefore need sufficient strength in the pins themselves and also in the securing of these pins in their sockets, would they not? A. Yes.    *    *    *    *    *

"XQ. Your position, as I understand it, is that the ability of the stop pins to withstand the stresses which would be imposed upon them in case of breakage of the controlling connections of the respective vanes during actual running of the turbine could be determined with certainty by calculation. Do I correctly understand your position? A. *The stresses cannot be determined accurately because the force is not definitely known.* It was a feature of the design of the stop pins that they should stop the vanes under all emergencies, conditions, such as we assume, but undoubtedly a condition could arise under which the guide vanes might be broken just as the condition could arise by which the casing of the turbine would be exploded or the shaft of the turbine twisted in two. The pins were designed and will be found of sufficient size for limiting the motion of the guide vanes under the worst assumed conditions with which we were familiar." (Italics ours.)

Appellant's views regarding the necessity of tests to reduce the invention to practice are concisely stated in his testimony. We quote:

"*    *    * No, the invention is simple and covers a stop or limit device for the motion of the guide vane and when the stop has been installed and the guide vane once adjusted to it, the device is complete and the invention an accomplished fact."

The witness Emil Gross was the only one who testified that the stop pins were tested by having the guide vanes swung violently against them.

In view of the fact that the tribunals below have stated the evidence in considerable detail and have analyzed it in their opinions, we deem it unnecessary to extend this opinion by an exhaustive discussion of the testimony. We think it is evident that a mere swinging of the guide vanes against the stop pins by two men, violently or otherwise, would prove nothing more than that the stop-pins were in proper position. Such a test would certainly not be of great importance, if its purpose was to determine whether the stop pins were of sufficient strength to withstand the incalculable forces to which they would be subjected in actual operation. Accordingly, one of the questions presented is whether or not the actual construction of the involved invention as a part of a hydraulic turbine is sufficient, as stated by appellant in his testimony, to establish reduction to practice.

Surely, in order to reduce the invention to practice, more would be required than the mere placing of the stop pins in proper position so that they would not interfere with the free motion of the guide vanes during normal operation. The precise purpose of the invention was not merely to permit free motion of the guide vanes during normal operation, but to prevent them, in the event of accidental breakage of their connections with the shifting ring, moving beyond a predetermined position and striking the vanes of the runner. Obviously, the desired results would not be obtained, unless the stop pins were of sufficient strength to accomplish their intended purpose.

It is conceded by appellant that the stresses or forces to which the pins might be subjected in actual operation could not be accurately calculated. There is some evidence to the effect that such forces could be determined with some reasonable degree of accuracy. However, the evidence submitted by appellant to establish that such forces were so ascertained and that the pins were designed to withstand them is not very satisfactory.

The witness Gross, testifying for appellant, said that, while he could not be positive, he thought the pins were installed in a turbine in the early part of December, 1924.

Appellant's witness Henry Walters stated that he was an inspector in the hydraulic

department of the Allis-Chalmers Manufacturing Company, appellant's assignee, that the stop pins were not installed in a hydraulic turbine prior to January, 1925, and that the records of his company indicated that the stop pins were installed in hydraulic turbines some time later than January 3, 1925, and prior to February 10, 1925.

We think that it has been clearly established by appellee that he conceived the invention early in 1919; that he, and some of his associates in the employ of the S. Morgan Smith Company, had discussed the question of the installation of the invention in hydraulic turbines from time to time, especially on July 29 and August 28, 1924, and thereafter; that, due to the fact that the vanes in turbines theretofore constructed by appellee's company were too narrow, or otherwise unsuitable to be used with inside stop pins, it was impossible, on August 28, 1924, for appellee to make practical use of the invention; that, on August 28, 1924, it was understood by appellee and the witness Jessop, chief engineer of appellee's assignee, that the invention would be utilized as soon as an order was received for the construction of a turbine; that early in October, 1924, an order for a turbine was received, and immediately thereafter, and until January, 1925, the use of the invention, as a part of the turbine to be constructed, was many times considered and discussed by appellee and others in the employ of the S. Morgan Smith Company; that drawings for the vanes of this turbine were prepared in October, 1924, pencil drawings of the invention being added thereto shortly thereafter and prior to November 26, 1924; and that the invention was actually installed in this turbine early in the year 1925.

It appears from the record that as early as November, 1924, appellee was making preparation for the filing of an application for a patent, and that, in December, 1924, the matter was in the hands of his patent attorney.

In view of the activities of appellee during July, the latter part of August, October, November, and December, 1924, and January and February, 1925, prior to the filing of his application, it is evident that he was not lacking in diligence. The installation of the invention in hydraulic turbines was a matter of importance, and required considerable time for discussion and consideration by those charged with the responsibility. That appellant, White, recognized the truth of this assertion, clearly appears from his tes-

timony, in which he stated that even the preparation of preliminary drawings might be subjected to considerable delay. In this connection he said:

"The actual work of putting the change on the drawing would, of course, not require very much time, but the discussion leading up to the actual change might take some little time. In other words, I would not go to the draftsman and say 'Put this in here at once.' I would tell my engineer in charge of design or the chief draftsman to make a preliminary drawing of such change for examination and discussion. A considerable time might well elapse between the request to make the change and the making of the actual change. Again, the conditions of the work in the shop might be such as to not require this change at once and press of other work frequently operates to delay such things. I am not prepared to say how long it would take or did take to make the change from the time it was suggested until the date was placed on the drawing."

Accordingly, we are of opinion that appellee was diligent from the time appellant entered the field—September 10, 1924, until appellee filed his application—February 20, 1925. Assuming, therefore, but not deciding, that appellant reduced the invention to practice shortly before appellee filed his application, nevertheless appellee was the first to conceive the invention, and, as he was not lacking in diligence, the tribunals below were right in holding that he was entitled to an award of priority.

The decision of the Board of Appeals is affirmed.

Affirmed.

LENROOT, Associate Judge (specially concurring).

I cannot agree with the conclusion of the majority of the court that there was no lack of diligence upon the part of appellee in reducing his invention to practice.

The rule is so well settled that it scarcely needs the citation of authority, that the reasonable diligence required of the first inventor, where another has entered the field and has reduced an invention to practice prior to the first inventor's reduction to practice, is diligence in perfecting and adapting his invention. Automatic Weighing Mach. Co. v. Pneumatic Scale Corp. (C. C. A.) 166 F. 288. The rule is also well established that in such cases the first inventor, to be entitled to an award of priority, has the burden of

showing that, immediately before his rival entered the field, and at that time, he was exercising due diligence in perfecting his invention and attempting to reduce it to actual practice. Mortocello v. Kobash, 39 F.(2d) 677, 17 C. C. P. A. 1095.

Applying these two principles to the case at bar, I think the record shows that appellee did nothing from the date of his conception in 1919 until some time between October 29 and November 26, 1924, to reduce his invention to practice. Appellant entered the field on September 10, 1924, and the majority opinion rests its finding of diligence upon the following statement contained therein:

"We think that it has been clearly established by appellee that he conceived the invention early in 1919; that he, and some of his associates in the employ of the S. Morgan Smith Company, had discussed the question of the installation of the invention in hydraulic turbines from time to time, especially on July 29, and August 28, 1924, and thereafter; that, due to the fact that the vanes in turbines theretofore constructed by appellee's company were too narrow, or otherwise unsuitable to be used with inside stop pins, it was impossible, on August 28, 1924, for appellee to make practical use of the invention; that, on August 28, 1924, it was understood by appellee and the witness, Jessop, chief engineer of appellee's assignee, that the invention would be utilized as soon as an order was received for the construction of a turbine; that, early in October, 1924, an order for a turbine was received and immediately thereafter and until January, 1925, the use of the invention, as a part of the turbine to be constructed, was many times considered and discussed by appellee and others in the employ of the S. Morgan Smith Company; that drawings for the vanes of this turbine were prepared in October, 1924, pencil drawings of the invention being added thereto shortly thereafter and prior to November 26, 1924; and that the invention was actually installed in this turbine early in the year 1925."

I had not supposed that discussion of an invention involving only the question of its use at some time in the future was any evidence of diligence in reducing it to practice. The record does show that appellee discussed with his fellow employees and officers of the company by which he was employed the question of whether his invention should be installed at some time in the future in a turbine. Appellee testified that in August, 1924, in conversation with George A. Jessop, chief

engineer of appellee's employers, "it was decided to put in inside gate stops on the first available order received after August, 1924." The record shows that the first "available order" was received in October, 1924, but that it was not decided until January, 1925, that the gate stops embodying the invention in issue should be installed in the turbine covered by that order.

In the case of Seeberger v. Dodge, 24 App. D. C. 476, one of the questions there under consideration was very similar to the question here under discussion. In that case the court said (page 485):

"Granting the contention that actual reduction to practice is preferable to that which is constructive, merely, as more to the interest of the public, and that reasonable indulgence ought to be extended to one pursuing that course in good faith, yet, when the construction of an experimental device involves so great cost and risk that an inventor, though possessed of sufficient means, may well hesitate to undertake the same entirely at his own expense, due diligence requires that he should then attempt to secure his right and promote the public interest by filing an application for a patent."

So here, if the invention could not be reduced to practice except by installation of the same in a very large and costly machine, instead of waiting for some indefinite time in the future to embody the invention in such machine, due diligence required that appellee file his application for a patent upon it, and thus secure a constructive reduction to practice of the same. This he did not do before appellant's alleged reduction to practice.

It seems to me that the majority opinion modifies the rule as to what constitutes diligence in reducing an invention to practice. If mere discussion of whether a proposed invention should be used commercially in the future, or even a tentative understanding that it shall be so used, is evidence of diligence in reducing an invention to practice, then I think that we have so broadly extended the rule of diligence as to destroy, in many cases, its proper application.

On the other hand, if it be conceded that mere discussion of the future use of an invention is not evidence of diligence, then it seems to me that the conclusion of the majority upon the question of diligence cannot be sustained, unless it be held that diligence by the first inventor, beginning more than a month after the second inventor had entered the field, is in this case sufficient to entitle

him to an award of priority. It seems to me that the reason for the rule that diligence upon the part of the first inventor must exist immediately prior to the time the second inventor enters the field is that any diligence of the first inventor first arising after the second inventor enters the field might be the result of his gaining some information concerning the activities of the second inventor. I believe that it is a wise and salutary rule that diligence must be shown immediately before and at the time that the second inventor enters the field, and that any diligence exercised by the first inventor only after the second inventor enters the field cannot avail the first inventor as against the claim of the second inventor, who has reduced his invention to practice before the reduction to practice by the first inventor. In the case at bar, there was at the very least a period of more than one month after the second inventor entered the field during which appellee exercised no diligence in reducing his invention to practice, according to the evidence in the record, and there is no evidence that he was exercising such diligence before appellant entered the field. For the reasons stated, assuming that the second inventor was the first to reduce to practice, I cannot agree with my brethren that appellee was in the exercise of such diligence in reducing his invention to practice as to entitle him to an award of priority.

Upon the question of reduction to practice, appellee's patent having been issued more than four months prior to the filing of the application of appellant, the burden was upon appellant to establish priority of invention beyond a reasonable doubt. I am frank to say that, were this a case where preponderance of evidence only was required, I should be of the opinion that appellant had sufficiently established reduction to practice of his invention prior to appellee's filing date, but I do agree with the statement in the majority opinion that the evidence is somewhat unsatisfactory in this respect. The record clearly shows that it was practical to determine the necessary size of the gate stops by certain mathematical computations, without resorting to an actual test. While it may be found from the testimony that such computations were made and relied upon, there is no direct evidence in the record that the party who made such computations was qualified to do so, and there is no direct evidence that any person qualified to pass upon and determine the strength of the pins actually did so. For this reason, I cannot say that appellant

has established priority of invention beyond a reasonable doubt, and I therefore concur in the conclusion of the majority that the decision of the Board of Appeals should be affirmed.

BLAND, Associate Judge (dissenting).

I regret that I find myself totally out of harmony with the majority in the conclusion reached, and in that portion of the opinion having reference to reduction to practice. While the conclusion is said to be reached on the issue of the diligence of the appellee, the reduction to practice of appellant is discussed in such a manner as to leave the definite impression that the majority, at least, has very grave doubts as to whether or not appellant reduced his invention to practice.

This court usually follows the commendable practice of not discussing or intimating its views upon questions which it does not care to decide and which are not essential to the decision of the case. The reduction to practice of appellant is not in this case, according to the views of the majority, and yet the question is discussed. A conclusion that there was no reduction to practice on the part of appellant adds no strength to, nor sheds any light upon, the very unsatisfactory testimony as to appellee's diligence. I fail to find any relevancy between the two issues. Appellee either was or was not diligent, without regard to appellant's acts. In my judgment the concurring opinion of my associate, Judge LENROOT, conclusively shows the lack of diligence on the part of appellee.

To my way of thinking, this is one of the peculiar kinds of inventions which does not require such a reduction to practice as that it be installed and operated until the contingency happens which is to call into operation the patented device. Following the logic of the opinion of the majority, it would not have been sufficient to constitute reduction to practice to have put the completed device in actual operation under normal conditions because the invention was not designed to operate under normal conditions, but to operate under abnormal conditions. The chain held the vane in normal conditions, but broke, and permitted the stop-pins to stop the vane when a log or some obstruction came against it with greater force than the normal flow of water. Putting the vane in normal operation would not test the strength of the pins until the chain broke. To hold that a reduction to practice of this kind of device requires that it must be tested under abnormal conditions would, under the circumstances, I think, be

unreasonable. No such requirement was made of appellee, because of the rule that filing of the application constitutes reduction to practice. The courts should not make a rule in a case of this character which puts the parties, while in the Patent Office, upon such an unequal basis. The practical result, in this kind of case, is that the first one to the Patent Office is declared to be entitled to the invention.

There is ample supporting authority for my views on this question, although none of the cases contains a statement of facts identical with those at bar. The peculiar nature of the device in question would, to me, seem to warrant the application of the rule laid down in Mason v. Hepburn, 13 App. D. C. 86, 1898 C. D. 510, in which a clip or attachment to a gun was held to have been reduced to practice when it was completely finished and ready for sale and use and was demonstrably capable of producing the result.

The entire record before us unquestionably shows that, at the time appellant claims his invention had been reduced to practice, it had been fully ascertained that it was capable of producing the result for which it was invented, and that it was completely finished and ready for sale and use. See, also, Rolfe v. Hoffman, 26 App. D. C. 336.